Slip Op. 11- 136

UNITED STATES COURT OF INTERNATIONAL TRADE

AIRFLOW TECHNOLOGY, INC.,                :

                                 *Plaintiff*,        :

                     v.                :        Court No. 02-00099

UNITED STATES,                                    :

                         *Defendant*.       :

[Plaintiff's motion for summary judgment is granted; defendant's cross-motion is denied.]

Dated:  October 31, 2011

Jessica R. Rifkin, Rodriguez O'Donnell Gonzalez & Williams, P.C., of Chicago, IL, argued for plaintiff.  With her on the brief was Thomas J. O'Donnell.

Mikki Cottet, Senior Trial Counsel, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for defendant.  With her on the brief were Tony West, Assistant Attorney General, and Barbara S. Williams, Attorney In Charge. Of counsel on the brief was Michael W. Heydrich, Office of the Assistant Chief Counsel, International Trade Litigation, Bureau of Customs and Border Protection, U.S. Department of Homeland Security, of New York, NY.

# OPINION

RIDGWAY, Judge:

This test case, on remand from the Court of Appeals for the Federal Circuit, concerns the classification of 21 entries of Sperifilt filter media ("Sperifilt") imported from Italy by plaintiff Airflow Technology, Inc. in 1998 and 1999.  *See generally* Airflow Technology, Inc. v. United States, 524 F.3d 1287 (Fed. Cir. 2008) ("Airflow II").  Airflow I granted the Government's cross-motion for summary judgment, sustaining the determination of the U.S. Customs Service classifying Sperifilt under subheading 5911.40.00 of the Harmonized Tariff Schedule of the United States

("HTSUS"). *See generally* Airflow Technology, Inc. v. United States, 31 CIT 524, 483 F. Supp. 2d

1337 (2007) ("Airflow I"), *rev'd and remanded*, 524 F.3d 1287 (Fed. Cir. 2008) ("Airflow II").[1]

Airflow appealed, and the Court of Appeals reversed and remanded. *See* Airflow II, 524 F.3d at

1293.[2]

The parties' cross-motions for summary judgment, filed on remand, are now pending. In its

motion, Airflow reiterates its claim that Sperifilt is classifiable under HTSUS heading 5603 –

specifically, subheading 5603.94.90, which covers "Nonwovens, whether or not impregnated,

coated, covered or laminated: Other: Weighing more than 150 g/m$^2$: Other: Other," and is duty-free.

*See* Subheading 5603.94.90, HTSUS; Memorandum in Support of Plaintiff's Motion for Summary

Judgment at 1, 5, 30 ("Pl.'s Brief"); Plaintiff's Opposition to Defendant's Cross-Motion for

Summary Judgment and Reply to Defendant's Opposition to Plaintiff's Motion for Summary

Judgment at 21-22 ("Pl.'s Reply Brief").[3]

For its part, the Government continues to argue that classification under HTSUS heading

5911 is proper. In light of Airflow II, the Government contends on remand that the appropriate

subheading is subheading 5911.10.20, which covers "Textile products and articles, for technical

uses, specified in note 7 to this chapter: Textile fabrics, felt and felt-lined woven fabrics, coated,

---

[1]The U.S. Customs Service – formerly part of the U.S. Department of Treasury – is now part of the U.S. Department of Homeland Security, and is commonly known as U.S. Customs and Border Protection. *See* Bull v. United States, 479 F.3d 1365, 1368 n.1 (Fed. Cir. 2007). The agency is referred to as "Customs" herein.

[2]Familiarity with Airflow I and Airflow II is presumed.

[3]All references herein are to the 1998 version of the HTSUS, which is identical to the 1999 version in all relevant respects.

covered or laminated with rubber, leather or other material, of a kind used for card clothing, and

similar fabrics of a kind used for other technical purposes, including narrow fabrics made of velvet

impregnated with rubber, for covering weaving spindles (weaving beams): Other," which carried

duty rates of 6% and 5.6% *ad valorem* in 1998 and 1999, respectively.  *See* Subheading 5911.10.20,

HTSUS; Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and In Support

of Defendant's Cross-Motion for Summary Judgment at 1, 5-6, 11-16, 22-23, 25 ("Def.'s Brief");

Defendant's Reply to Plaintiff's Opposition to Defendant's Cross-Motion for Summary Judgment

at 1, 5-9 ("Def.'s Reply Brief").  In the alternative, the Government argues for classification under

subheading 5911.90.00, which covers "Textile products and articles, for technical uses, specified

in note 7 to this chapter:  Other," which carried duty rates of 6% and 5.6% in 1998 and 1999,

respectively.  *See* Subheading 5911.90.00, HTSUS; Def.'s Brief at 1-2, 5-6, 11-12, 16-23, 25; Def.'s

Reply Brief at 1, 5, 10-15.

        Jurisdiction lies under 28 U.S.C. § 1581(a) (1994).[4]  For the reasons that follow, the subject

entries of Sperifilt filter media must be classified under HTSUS subheading 5603.94.90.  Airflow's

motion for summary judgment therefore must be granted, and the Government's cross-motion

denied.

## I. **Background**

        As detailed in <u>Airflow I</u>, Sperifilt filter media "is made up of three basic components: a

high-loft, nonwoven medium made of polyester thermobonded fibers; a polyester yarn backing net;

------

        [4]All statutory citations herein (other than citations to the HTSUS) are to the 1994 edition of
the United States Code.

and a tackifying substance (*i.e.*, an adhesive)," and "is designed for use, manufactured for use, and

actually used for air filtration in paint spray booths."  *See* <u>Airflow I</u>, 31 CIT at 525-26, 483 F. Supp.

2d at 1340; *see also* <u>Airflow II</u>, 524 F.3d at 1289.  Sperifilt is manufactured by Speritex S.p.A. of

Brusnengo, Italy, using the following process:

> First, polyester staple fibers of different sizes are carded, to form uniform sheets of
> fibers.  Several sheets are then layered, to achieve a specific weight and thickness
> sufficient to create a filter medium that progressively increases in density in one
> direction (the direction of the intended airflow), so that air will pass through the filter
> from the less dense portion through progressively denser portions, thus filtering out
> progressively smaller particles.  After the layers are thermally bonded together, the
> filter medium is impregnated with a tackifying substance (*i.e.*, an adhesive).  The
> tackified filter medium is then bonded to a backing (a net of polyester yarn) on the
> side of the finished product where the flow of filtered air will exit.  The net backing
> ensures dimensional stability under high temperature conditions, and helps prevent
> fibers and particles from escaping.  The result is a high-loft, nonwoven filter medium
> that captures particles of disparate sizes at different depths of the medium.
> According to Airflow, the finished product – the imported filter material – is
> produced in rolls that are approximately 66 feet long and between 22 and 81 inches
> wide.

<u>Airflow I</u>, 31 CIT at 526, 483 F. Supp. 2d at 1340 (citations omitted); *see also* <u>Airflow II</u>, 524 F.3d

at 1289.

In 1998 and 1999, 21 entries of Sperifilt were imported through the Port of Chicago and were

liquidated by Customs under HTSUS subheading 5911.40.00, which covers "Textile products and

articles, for technical uses, specified in note 7 to this chapter: Straining cloth of a kind used in oil

presses or the like . . . ," with customs duties imposed at the rates of 11% and 10.5% for 1998 and

1999, respectively.  *See* <u>Airflow II</u>, 524 F.3d at 1289; <u>Airflow I</u>, 31 CIT at 524, 483 F. Supp. 2d at

1339.  Airflow filed a protest, which was denied, and this action followed.  *See* <u>Airflow II</u>, 524 F.3d

at 1289; *see generally* <u>Airflow I</u>, 31 CIT 524, 483 F. Supp. 2d 1337.

In <u>Airflow I</u>, Airflow argued that Sperifilt should have been classified under HTSUS subheading 5603.94.90, a duty-free provision covering "Nonwovens, whether or not impregnated, coated, covered or laminated: Other: Weighing more than 150 g/m$^2$: Other: Other." *See* <u>Airflow I</u>, 31 CIT at 524, 483 F. Supp. 2d at 1339; Subheading 5603.94.90, HTSUS; *see also* <u>Airflow II</u>, 524 F.3d at 1289-90. Airflow argued in the alternative that classification was appropriate under subheading 5911.90.00, a residual provision covering "Textile products and articles, for technical uses, specified in note 7 to this chapter: Other," dutiable at the rate of 6% and 5.6% in 1998 and 1999, respectively. *See* <u>Airflow I</u>, 31 CIT at 524, 483 F. Supp. 2d at 1339; Subheading 5911.90.00, HTSUS.

Ruling on cross-motions for summary judgment, <u>Airflow I</u> determined that Sperifilt falls within the scope of the term "straining cloth" as the term is used in Note 7(a)(iii) to Chapter 59 of the HTSUS and in subheading 5911.40.00. *See generally* <u>Airflow I</u>, 31 CIT at 529-38, 483 F. Supp. 2d at 1343-50; *see also* <u>Airflow II</u>, 524 F.3d at 1290. Moreover, citing an Explanatory Note to heading 5603 which expressly excludes from that heading "Nonwovens for technical uses, of heading 59.11," <u>Airflow I</u> concluded that a determination that merchandise is classifiable under a subheading of heading 5911 precludes classification of the merchandise under heading 5603. *See* <u>Airflow I</u>, 31 CIT at 538, 483 F. Supp. 2d at 1350. <u>Airflow I</u> therefore sustained Customs' classification of Sperifilt under subheading 5911.40.00 of the HTSUS, and entered summary judgment in favor of the Government. *See* <u>Airflow I</u>, 31 CIT at 541, 483 F. Supp. 2d at 1353; *see also* <u>Airflow II</u>, 524 F.3d at 1290.

Airflow appealed, and the Court of Appeals reversed and remanded. *See generally* <u>Airflow</u>

II, 524 F.3d 1287.  Considering only "the proper interpretation of . . . the language of subheading 5911.40.00," the Court of Appeals disagreed with Airflow I's conclusion that the HTSUS term "straining cloth" covered air filtration media such as Sperifilt.  See id., 524 F.3d at 1290, 1292. Although the Court of Appeals acknowledged that "the terms 'straining' and 'filtering' carry similar meanings," the court concluded that the meanings of the terms are not "identical."  See id., 524 F.3d at 1292.  According to the Court of Appeals, the two terms "differ in one critical aspect – 'straining' suggests removing solids from liquids while 'filtering' suggests removing solids from liquids or gases."  See id.[5]  The Court of Appeals ultimately concluded that the tariff term "straining cloths"

---

[5]The Court of Appeals recognized that the Explanatory Note to heading 5911 on which Airflow I heavily relied "indicates that subheading 5911.40.00 applies broadly to any type of filtering cloth, including those used for filtering air."  See Airflow II, 524 F.3d at 1292-93 (discussing Explanatory Notes, Heading 5911, at (A)(3)); see generally Airflow I, 31 CIT at 534, 483 F. Supp. 2d at 1347 (stating, inter alia, that "the Explanatory Notes specifically state that the filtration media embraced by heading 5911 includes media 'for gas cleaning or similar technical applications in industrial dust collecting systems," and thus "make it clear that Sperifilt filter media is covered by subheading 5911.40.00") (emphasis added in Airflow I).  However, because the Court of Appeals considered the language of the tariff provision itself (i.e., "straining cloth") to be "unambiguous and the Explanatory Notes contradictory," the court gave no weight to the Explanatory Note.  See Airflow II, 524 F.3d at 1293.

In reaching its decision in Airflow II, the Court of Appeals apparently was not presented with, and therefore did not have the benefit of, dictionary definitions indicating that, although "strain" may more frequently refer to the separation of a solid from a liquid, the term in fact is not necessarily so narrowly defined and, indeed, can be synonymous with the term "filter."  See, e.g., American Heritage Dictionary of the English Language 1710 (4th ed. 2000) (defining "strain" as "[t]o draw off or remove by filtration," and using the separation of solid from liquid as merely illustration); 16 Oxford English Dictionary 828 (2d ed. 1989) (defining "strain" as, inter alia, "[t]o press through a filtering medium, to filter"); id. at 830 (defining "straining" as, inter alia, "filtering, sifting, expressing"); Webster's New World Dictionary, Second College Edition 1406 (1979) (defining "strain" as, inter alia, "to pass through a screen, sieve, filter, etc.; [to] filter"; and "to remove or free by filtration, etc."); see also Recording of Oral Argument at 1:07:50-1:08:50 (counsel for Government voicing its disagreement with Airflow II as to definition of "strain," and arguing that "there [are] other dictionaries, [which] are American dictionaries, that set forth the common

is "limited to products that separate solids from liquids, and does not encompass products, such as Sperifilt, that can only separate solids from gases," and held that Sperifilt therefore could not be classified under subheading 5911.40.00 of the HTSUS. *See id*., 524 F.3d at 1293. As such, the Court of Appeals reversed <u>Airflow I</u>, and remanded the matter for a determination as to "whether Sperifilt is more properly classified under subheading 5911.90.00, directed to 'other,' or under subheading 5603.94.90" of the HTSUS. *See id*.

## II.  Standard of Review

Customs classification decisions are reviewed *de novo*, through a two-step analysis. *See* 28 U.S.C. § 2640; <u>Faus Group, Inc. v. United States</u>, 581 F.3d 1369, 1371-72 (Fed. Cir. 2009). The first step of the analysis addresses the proper meaning of the relevant tariff provisions, which is a question of law. The second step involves determining whether the merchandise at issue falls within a particular tariff provision as construed. *See id*. (*citing* <u>Orlando Food Corp. v. United States</u>, 140

---

meaning of the term ["strain"], and expressly provide that it includes . . . 'strains gases, liquids, and dry goods'"); *id*. at 1:38:40-1:41:10 (counsel for Government arguing that term "strain" is defined broadly, as "to pass through a screen, sieve, filter, etc.; filter," but acknowledging that Government failed to present this definition to Court of Appeals).

<u>Airflow II</u> similarly did not address the fact that the text of the Explanatory Note to heading 5911 on which <u>Airflow I</u> was predicated, which expressly states that heading 5911 encompasses filter media used in "technical applications in industrial dust collecting systems" (*i.e.*, air filters such as Sperifilt), is the same text as that in the 1986 version of the Explanatory Notes that was in place and thus available to Congress when it adopted the HTSUS in 1989. *See* <u>Airflow I</u>, 31 CIT at 534 n.12, 483 F. Supp. 2d at 1347 n.12 (discussing Explanatory Notes, Heading 5911, at (A)(3)). Thus, as <u>Airflow I</u> explained, "to the extent that legislative intent can be inferred from the Explanatory Notes then in place, it would seem that Congress intended heading 5911 to be interpreted in a manner consistent with those Explanatory Notes, which specifically refer to 'straining cloth' as including filter fabrics . . . that are used for purposes other than filtering liquids." *See id*.

F.3d 1437, 1439 (Fed. Cir. 1998)).

Under USCIT Rule 56, summary judgment is appropriate where "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law.  *See* USCIT R. 56(c).  Summary judgment is thus appropriate in a customs classification case if there is no genuine dispute of material fact (because the nature of the merchandise at issue is not in question), such that the decision on the classification of the merchandise turns solely on the proper meaning and scope of the relevant tariff provisions.  *See* Faus Group, 581 F.3d at 1371-72.

In the present case, the parties differ as to the meaning and scope of the various tariff provisions in question.  However, there is no genuine issue as to any material fact.  This matter is therefore ripe for summary judgment.

## III.  Analysis

The tariff classification of all merchandise imported into the United States is governed by the General Rules of Interpretation ("GRIs") and the Additional U.S. Rules of Interpretation ("ARIs"), which provide a framework for classification under the HTSUS, and are to be applied in numerical order.  *See* BASF Corp. v. United States, 482 F.3d 1324, 1325-26 (Fed. Cir. 2007); 19 U.S.C. § 1202.[6]  Most merchandise is classified pursuant to GRI 1, which provides for classification

_____

[6]The HTSUS consists of the General Notes, the General Rules of Interpretation ("GRIs"), the Additional U.S. Rules of Interpretation ("ARIs"), and Sections I to XXII of the HTSUS (including Chapters 1 to 99, together with all Section Notes and Chapter Notes, article provisions, and tariff and other treatment accorded thereto), as well as the Chemical Appendix.  *See* BASF Corp., 482 F.3d at 1325-26; Libas, Ltd. v. United States, 193 F.3d 1361, 1364 (Fed. Cir. 1999) (noting that the HTSUS "is indeed a statute but is not published physically in the United States Code") (*citing* 19 U.S.C. § 1202).  The terms of the HTSUS are "considered 'statutory provisions of law for all purposes.'" *See* Alcan Aluminum Corp. v. United States, 165 F.3d 898, 904 n.5 (Fed.

"according to the terms of the headings and any relative section or chapter notes."  *See* GRI 1,

HTSUS.  Only if the headings and Chapter and Section Notes do not determine classification does

one look to the subordinate GRIs.  *See* Mita Copystar America v. United States, 160 F.3d 710, 712

(Fed. Cir. 1998).  When an imported item is classifiable based on application of GRI 1, recourse to

the subsequent GRIs and the ARIs is unnecessary and inappropriate.  *See* BASF Corp., 482 F.3d at

1325-26.  Moreover, the appropriate subheading for classification is considered only after the proper

heading is determined.  *See* Faus Group, 581 F.3d at 1372.[7]

        The first step in a classification analysis is thus to construe the terms of the headings of the

HTSUS, together with any pertinent Section and Chapter Notes (which are statutory law), to

determine whether they require a specific classification.  *See* Avenues in Leather, Inc. v. United

States, 423 F.3d 1326, 1333 (Fed. Cir. 2005) (explaining that Section Notes and Chapter Notes "are

not optional interpretive rules, but are statutory law, codified at 19 U.S.C. § 1202") (internal

quotation marks omitted); Degussa Corp. v. United States, 508 F.3d 1044, 1047 (Fed. Cir. 2007)

(stating that "section and chapter notes are integral parts of the HTSUS, and have the same legal

force as the text of the headings").

        Tariff terms are construed "according to their common commercial meanings"; and a court

may rely both on its own understanding of a term and on lexicographic and scientific authorities.

_____

Cir. 1999) (internal citation omitted).

        [7]GRI 6 governs classification at the subheading level, and requires a renewed sequential application of GRIs 1 to 5 to the particular subheadings under consideration.  *See* GRI 6, HTSUS ("For legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the [GRIs], on the understanding that only subheadings at the same level are comparable.").

*See* Millenium Lumber Distribution Ltd. v. United States, 558 F.3d 1326, 1328-29 (Fed. Cir. 2009);

Len-Ron Mfg. Co. v. United States, 334 F.3d 1304, 1309 (Fed. Cir. 2003).  Also instructive are the

Explanatory Notes to the Harmonized Commodity Description and Coding System ("Explanatory

Notes"), "which – although not controlling – provide interpretive guidance."  *See* E.T. Horn Co. v.

United States, 367 F.3d 1326, 1329 (Fed. Cir. 2004) (citation omitted); *see generally* World Customs

Organization, Harmonized Commodity Description and Coding System (2d ed. 1996).[8]

        The Explanatory Notes are the official interpretation of the Harmonized Commodity

Description and Coding System (on which the HTSUS is based), as set forth by the World Customs

Organization (the same body which drafts the international nomenclature).  *See* Rocknel Fastener,

Inc. v. United States, 267 F.3d 1354, 1360 (Fed. Cir. 2001) (explaining that Explanatory Notes are

"prepared by the World Customs organization to accompany the international harmonized

schedule").  Accordingly, although the Explanatory Notes "do not constitute controlling legislative

history," they serve a critical function as an interpretative supplement to the HTSUS, and "are

intended to clarify the scope of HTSUS [provisions,] and to offer guidance in interpreting [those

provisions]."  *See* Mita Copystar, 21 F.3d at 1082 (citation omitted).  The Explanatory Notes are

---

        [8]As Congress has recognized, the Explanatory Notes "provide a commentary on the scope
of each heading of the Harmonized System and are thus useful in ascertaining the classification of
merchandise under the system."  *See* H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 549 (1988),
*reprinted in* 1988 U.S.C.C.A.N. 1547, 1582; *see also* Guidance for Interpretation of Harmonized
System, 54 Fed. Reg. 35,127, 35,128 (Aug. 23, 1989) (noting that the  Explanatory Notes provide
a commentary on the scope of each heading of the HTSUS, and are the official interpretation of the
Harmonized System at the international level).

        All citations to the Explanatory Notes herein are to the 1996 version of the Explanatory
Notes.

thus highly authoritative – "persuasive" and "'generally indicative of the proper interpretation of a tariff provision.'" *See* Agfa Corp. v. United States, 520 F.3d 1326, 1329-30 (Fed. Cir. 2008) (*quoting* Degussa Corp., 508 F.3d at 1047 (citation omitted)).

The issue presented by the pending motions is whether, in light of Airflow II, the subject entries of Sperifilt filter media are classifiable under heading 5911 as "Textile products and articles, for technical uses, specified in note 7 to this chapter" (*i.e.*, Chapter 59), as the Government contends, or under heading 5603 as "Nonwovens, whether or not impregnated, coated, covered or laminated," as Airflow maintains. *See* Heading 5911, HTSUS; Heading 5603, HTSUS. The Explanatory Notes to heading 5603 expressly exclude "[n]onwovens for technical uses, of heading 59.11" from classification under heading 5603. *See* Explanatory Notes, Heading 5603, at (ij).[9] Therefore, if the entries of Sperifilt at issue here are classifiable under heading 5911, they cannot be classified under heading 5603. Thus, the threshold question to be answered is whether the subject entries are properly classifiable under heading 5911. In light of Airflow II, and for the reasons summarized below, the response to this question is "no." Accordingly, the subject entries of Sperifilt must be classified under heading 5603, based on a straightforward application of GRI 1.[10]

---

[9]*See also* FilmTec Corp. v. United States, 27 CIT 1730, 1736-37, 293 F. Supp. 2d 1364, 1369-70 (2003) (discussing Explanatory Notes' exclusion of "[n]onwovens for technical uses, of heading 59.11" from scope of heading 5603).

More generally, the Explanatory Notes also exclude from the scope of heading 5603 merchandise that is "covered more specifically by other headings." *See* Explanatory Notes, Heading 5603; *see also* Airflow II, 524 F.3d at 1290 (referencing exclusion); Airflow I, 31 CIT at 527-28, 483 F. Supp. 2d at 1341-42 (discussing Explanatory Notes to heading 5603).

[10]The parties devote much ink to the scope of this remand proceeding. *See* Pl.'s Brief at 7; Def.'s Brief at 8-11; Pl.'s Reply Brief at 2-3; Def.'s Reply Brief at 2-4. Specifically, the parties

A.  <u>Heading 5911</u>

Heading 5911 covers "[t]extile products and articles, for technical uses, specified in note 7

to this chapter."  *See* Heading 5911, HTSUS.  Thus, merchandise may be classified under heading

5911 only if it is: (1) a textile product or article; (2) for technical uses; (3) specified in Note 7 to

Chapter 59.  *See* Heading 5911, HTSUS.  Criteria (1) and (2) above are not in dispute.  As <u>Airflow</u>

<u>I</u> explained,  "[b]ecause Sperifilt filter media is made of polyester fibers and is manufactured for use

in industrial applications, it is . . . a '[t]extile product[] . . . [or] article[ ] for technical use[ ].'"  *See*

<u>Airflow I</u>, 31 CIT at 528, 483 F. Supp. 2d at 1342 (*quoting* Heading 5911, HTSUS) (first alteration

added).[11]  Accordingly, if the subject entries fall within the range of merchandise set forth in Note

7, the entries are properly classified under heading 5911.  *See* <u>Airflow I</u>, 31 CIT at 528, 483 F. Supp.

2d at 1342; Heading 5911, HTSUS.

Note 7 to Chapter 59 specifies that "[h]eading 5911 applies to the following goods, which

do not fall in any other heading of section XI":

> (a) Textile products in the piece, cut to length or simply cut to rectangular (including
> square) shape (other than those having the character of the products of heading 5908
> to 5910), the following only:

---

debated whether, on remand, it would be permissible to classify the merchandise at issue under
subheading 5911.10.20, given that the remand instructions in <u>Airflow II</u> made no mention of that
subheading, and instead framed the issue on remand as "whether Sperifilt is more properly classified
under subheading 5911.90.00, . . . or under subheading 5603.94.94."  *See* <u>Airflow II</u>, 524 F.3d at
1293.  The outcome below (*i.e.*, classification under subheading 5603.94.90) obviates any need to
reach the merits of the parties' dispute concerning the scope of the remand.

[11]This threshold determination was unaffected by <u>Airflow II</u>, which considered only "the
proper interpretation of 'straining cloth of a kind used in oil presses or the like'– the language of
subheading 5911.40.00."  *See* <u>Airflow II</u>, 524 F.3d at 1290.

(i)  Textile fabrics, felt and felt-lined woven fabrics, coated, covered or laminated with rubber, leather or other material, of a kind used for card clothing, and similar fabrics of a kind used for other technical purposes, including narrow fabrics made of velvet impregnated with rubber, for covering weaving spindles (weaving beams);

(ii)  Bolting cloth;

(iii)  Straining cloth of a kind used in oil presses or the like, of textile material or of human hair;

(iv)  Flat woven textile fabrics with multiple warp or weft, whether or not felted, impregnated or coated, of a kind used in machinery or for other technical purposes;

(v)  Textile fabric reinforced with metal, of a kind used for technical purposes;

(vi)  Cords, braids and the like, whether or not coated, impregnated or reinforced with metal, of a kind used in industry as packing or lubricating materials;

(b)  Textile articles (other than those of headings 5908 to 5910) of a kind used for technical purposes (for example, textile fabrics and felts, endless or fitted with linking devices, of a kind used in papermaking or similar machines (for example, for pulp or asbestos-cement), gaskets, washers, polishing discs and other machinery parts).

Note 7 to Chapter 59, HTSUS.[12]  According to the Explanatory Notes, although the textile products and articles specified in Note 7 may be *prima facie* classifiable in other headings, they must be classified within heading 5911, because they "present particular characteristics which identify them as being for use in various types of machinery, apparatus, equipment or instruments or as tools or parts of tools."  *See* Explanatory Notes, Heading 5911.

---

[12]Certain subheadings of heading 5911 specifically cover some of the individual Note 7(a) categories.  For example, subheading 5911.10 covers Note 7(a)(i) goods; subheading 5911.20 covers Note 7(a)(ii) goods; subheading 5911.40 covers Note 7(a)(iii) goods; and subheading 5911.90.0040 covers Note 7(a)(vi) goods.  *See* Heading 5911, HTSUS.

Airflow II rejected Customs' determination that Sperifilt falls within the scope of Note 7(a)(iii) to Chapter 59 and is therefore properly classified under subheading 5911.40.00.  *See* Airflow II, 524 F.3d at 1293.  With subheading 5911.40.00 off the table, the Government now contends that the subject entries of Sperifilt fall within the scope of Note 7(a)(i) (and thus should be classified under subheading 5911.10.20) or, in the alternative, that the entries fall within the scope of Note 7(b) (and are thus classifiable under subheading 5911.90.00).  *See generally* Def.'s Brief at 11-23; Def.'s Reply Brief at 5-15.

As Airflow explains, however, contrary to the Government's claims, Sperifilt does not fall within Chapter Note 7(a)(i), "nor is it a textile 'article' provided for in Chapter Note 7(b)."  *See* Pl.'s Brief at 5; *see also* Pl.'s Brief at 9; Pl.'s Reply Brief at 21; *see generally* Pl.'s Brief at 5, 8-29, 30; Pl.'s Reply Brief at 3-21.[13]  The subject entries therefore cannot be classified under heading 5911 of the HTSUS.

## 1. Note 7(a)(i) to Chapter 59

The Government first argues that Sperifilt filter media falls within the scope of Note 7(a)(i), which corresponds to classification under subheading 5911.10.  *See generally* Def.'s Brief at 5-6, 13-16, 22-23; Def.'s Reply Brief at 5-9; *see also* Note 7(a)(i) to Chapter 59, HTSUS; Subheading 5911.10, HTSUS (mirroring the language of Note 7(a)(i)).  Note 7(a)(i) includes only those "[t]extile

---

[13]Because the Court of Appeals held that Sperifilt is not classifiable under subheading 5911.40.00 (and is therefore not within the scope of Note 7(a)(iii)), and because, as both parties observe, Sperifilt clearly does not "fall within the scope of any of the categories of goods identified in Note [] 7(a)(ii), (iv), (v), or (vi)," consideration of Note 7 is limited to Note 7(a)(i) and Note 7(b). *See* Def.'s Brief at 13; *see also* Pl.'s Brief at 20-22.

products in the piece, cut to length or simply cut to rectangular . . . shape," that are either: "[1] Textile fabrics, felt and felt-lined woven fabrics, coated, covered or laminated with rubber, leather or other material, of a kind used for card clothing, [or] [2] similar fabrics of a kind used for other technical purposes, including narrow fabrics made of velvet impregnated with rubber, for covering weaving spindles (weaving beams)."  *See* Note 7(a)(i) to Chapter 59, HTSUS.[14]

According to the Government, Note 7(a)(i) covers fabrics that are of a "class or kind" of card clothing material, as well as "similar fabrics" used for other technical purposes, such as Sperifilt filter media.  *See* Def.'s Brief at 14-16; Def.'s Reply Brief at 5-9.  The Government argues that Sperifilt falls within Note 7(a)(i) because it is a nonwoven fabric similar to felt, and Note 7(a)(i) expressly includes "felt" and "similar fabrics."  *See* Def.'s Brief at 14-16; Def.'s Reply Brief at 9. Based on this reading, the Government contends that Sperifilt is clearly a "similar fabric of a kind used for other technical purposes."  *See* Def.'s Reply Brief at 8-9; Def.'s Brief at 14-15.

As outlined below, however, Sperifilt filter media is neither a textile fabric, felt or felt-lined woven fabric, coated, covered or laminated with rubber, leather or other material, of a kind used for card clothing, nor a similar fabric of a kind used for other technical purposes.

---

[14]In this context, the phrase "in the piece" refers to a length of material that could "vary[] from 40 to 120 yards."  *See* Webster's Third New International Dictionary 1712 (1981) (defining "piece" as "a length varying from 40 to 120 yards of cloth suitable for processing and [especially] for dying or finishing"); *see also* 11 Oxford English Dictionary 793 (2d ed. 1989) (defining "piece" as, *inter alia*, "[a] length (varying according to the material) in which cloth or other textile fabric is woven," and explaining (as an example) that "[a] 'piece' of cotton cloth varies from twenty-four to forty-seven yards in length, and from twenty-eight to forty inches in width") (citation omitted).

　　　a.  "Textile fabrics, felt and felt-lined woven fabrics, coated, covered or laminated
　　　　with rubber, leather or other material, of a kind used for card clothing"

The subject merchandise is not a textile fabric, a felt, or a felt-lined woven fabric (regardless of whether it may be "coated, covered or laminated with rubber, leather or other material").  Nor is it a material "of a kind used for card clothing."

First, Sperifilt is not a "textile fabric."  Because Note 1 to Chapter 59 limits the term "textile fabrics" used in Chapter 59 to "the *woven fabrics* of [various chapters and headings], the braids and ornamental trimmings in the piece of heading 5808 and the knitted or crocheted fabrics of heading 6002," Sperifilt – which is a nonwoven – is not a "textile fabric" for purposes of Note 7(a)(i).  *See* Note 1 to Chapter 59, HTSUS (emphasis added).[15]  There is no special context here which might warrant a definition other than that provided for in the relevant chapter notes.  Thus, as Airflow argues and the Government concedes, because Sperifilt is not woven, knitted, nor crocheted, and because it is not a braid or ornamental trimming, it cannot be considered a "textile fabric" within the scope of Note 7(a)(i) to Chapter 59.  *See* Pl.'s Brief at 10-11; Def.'s Brief at 13-14, 15; Note 1 to Chapter 59, HTSUS.[16]

_____

[15]In full, Note 1 provides that: "[e]xcept where the context otherwise requires," the expression "textile fabrics" used in Chapter 59 "applies only to the *woven fabrics* of chapters 50 to 55 [covering various woven fabrics, including silk, wool and other animal hair, cotton, vegetable textile fibers and paper yarn, man-made filaments, and man-made stable fibers] and headings 5803 [gauze] and 5806 [narrow woven fabrics and narrow fabrics consisting of warp without weft assembled by means of an adhesive], the braids and ornamental trimmings in the piece of heading 5808 and the knitted or crocheted fabrics of heading 6002."  *See* Note 1 to Chapter 59, HTSUS (emphasis added).

[16]Similarly, because Sperifilt is nonwoven, it also cannot be considered a "felt-lined woven fabric."

Second, Sperifilt filter media is not a "felt." *See* Def.'s Brief at 15 (acknowledging that Sperifilt is not felt); Pl.'s Reply Brief at 4 n.2 (same).  For purposes of classification under the HTSUS, "'felt' and 'nonwovens' are distinct and separate entities" covered by separate HTSUS headings. *See* Pl.'s Reply Brief at 4 n.2; Heading 5602, HTSUS (covering various types of "[f]elt"); Heading 5603, HTSUS (covering various types of "[n]onwovens"); *see also* Note 3 to Chapter 56, HTSUS (stating that "[h]eadings 5602 and 5603 cover respectively felt and nonwovens"). Therefore, because the subject merchandise is *prima facie* classifiable as a heading 5603 "nonwoven" and not as a heading 5602 "felt," it cannot be considered "felt" for purposes of Note 7(a)(i) to Chapter 59.

Finally, Sperifilt plainly is not a textile product "of a kind used for card clothing."  "Carding" is a process where "[a] wire-toothed brush or a machine fitted with rows of wire teeth [*i.e.*, a carding machine] . . . disentangle[s] fibers, as of wool, prior to spinning." *See* American Heritage Dictionary of the English Language 280 (4th ed. 2000).[17] A "carding machine" is "a machine for carding wool, cotton, or other fiber consisting of cylinders having intermeshing wire teeth and revolving at different speeds or in opposite directions." *See* Webster's Third New International Dictionary 338 (1981); Plaintiff's Statement fo Material Facts as to Which There is No Genuine Issue to Be Tried ("Pl.'s Statement of Facts") ¶¶ 17-28 (describing carding, carding machines, card clothing, and card

---

[17]*See also* Webster's Third New International Dictionary 337 (1981) (defining "card" as, *inter alia*, "to cleanse, disentangle, and collect together (as animal or vegetable fibers) by the use of a card preparatory to spinning, the process being used to prepare fibers of relatively short length"); 2 Oxford English Dictionary 889 (2d ed. 1989) (defining "card" as, *inter alia*, "[t]o prepare wool, tow, etc., for spinning, by combing out impurities and parting and straightening the [fibers] with a card").

clothing foundation cloth); Defendant's Response to Plaintiff's Statement of Material Facts as to

Which No Genuine Issue Exists ("Def.'s Response to Pl.'s Statement of Facts") ¶¶ 17-28 (admitting

Airflow's descriptions, albeit disputing relevance).  The cylinders of a carding machine are covered

with "card clothing," which is "material consisting of leather or cloth in which [wire] teeth are set."

*See* Webster's Third New International Dictionary 337 (1981).[18]

Here, as both parties acknowledge, Sperifilt is an air filtration medium, not a material "of

a kind used for card clothing."  *See* Pl.'s Brief at 11-17; Def.'s Reply Brief at 7.  In other words,

Sperifilt is not used as card clothing and is not "commercially fungible" with goods used as card

clothing.  *See* Primal Lite, Inc. v. United States, 182 F.3d 1362, 1363-64 (Fed. Cir. 1999) (stating

that "class or kind" of good referred to in ARI 1(a) is limited to "those goods that are commercially

fungible with the imported goods").  Sperifilt therefore does not fall within the scope of the first part

of Note 7(a)(i) to Chapter 59, covering certain fabrics of a kind used for card clothing.  *See* Note

7(a)(i) to Chapter 59, HTSUS.

   b. "[S]imilar fabrics of a kind used for other technical purposes"

In light of the above, Sperifilt filter media can fall within the scope of Note 7(a)(i) to Chapter

59 only if it is a "similar fabric[] of a kind used for other technical purposes [*i.e.*, other than card

---

[18]*See also* 2 Oxford English Dictionary 887 (2d ed. 1989) (referring to "card-cloth" and "card-clothing" as "the leather or indiarubber backing of a card"); 2 Oxford English Dictionary 886-87 (2d ed. 1989) (defining "card" as, *inter alia*, "[a] sort of wire brush for the [combing out, and setting in order the fibers of wool, hemp, etc.], consisting of a strip of leather, vulcanized rubber, or similar material, into which short steel wires are inserted.  These strips are fixed on a flat surface or on the cylinder of a carding-machine, and the wool is passed between two sets of them working with each other.").

clothing]." *See* Note 7(a)(i) to Chapter 59, HTSUS.[19]  According to the Government, Sperifilt is

covered by Note 7(a)(i) because it is "used for other technical purposes" and "[shares] similar

characteristics [with] the fabrics identified in Chapter 59 Note 7(a)(i)."  *See* Def.'s Brief at 15; *see*

*also id.* at 14 (arguing that Note 7(a)(i) includes "nonwovens (such as felt), combinations of

nonwovens and textile fabrics (such as felt-lined woven fabrics), and 'similar fabrics'"); *id.* at 16

(arguing that Sperifilt filter media "shares similar characteristics to 'felt'"); Def.'s Reply Brief at

8-9 (arguing that "Sperifilt falls within the scope of Note 7(a)(i)").  But, although Sperifilt is indeed

used for "other technical purposes" (*i.e.*, air filtration in industrial spray paint booths), Sperifilt is

not "similar" to the material described in the first part of Note 7(a)(i) to Chapter 59.

Contrary to the Government's claims, merchandise does not fall within the scope of Note

7(a)(i) merely because it shares characteristics with "[t]extile fabrics, felt [or] felt-lined woven

fabrics."  *See* Note 7(a)(i) to Chapter 59, HTSUS; Def.'s Brief at 14-16; *see also* Def.'s Reply Brief

at 4-9.  As the text of the note makes clear, Note 7(a)(i) "similar fabrics of a kind used for other

technical purposes" must be similar to "[t]extile fabrics, felt and felt-lined woven fabrics, *coated,*

---

[19]Although not a "textile fabric" under Note 1 to Chapter 59, a nonwoven such as Sperifilt is nevertheless a "fabric."  *See* Def.'s Brief at 15 (stating that "[a]lthough not statutorily considered a 'textile fabric,' or a felt, Sperifilt is certainly a fabric"); Defendant's Additional Statement of Material Facts as to Which No Genuine Issue Exists ¶ 1 (stating that "[a]s a nonwoven cloth, Sperifilt is a fabric"); Plaintiff's Response to Defendant's Additional Statement of Material Facts as to Which No Genuine Issue Exists ¶ 1 (admitting that "Sperifilt is a nonwoven, and that it may be considered a 'fabric' under the broadest definitions," but averring "that other definitions of 'fabric' are more restrictive"); *see also* American Heritage Dictionary of the English Language 1198 (4th ed. 2000) (defining "nonwoven" as "[m]aterial or . . . fabric made by a process not involving weaving" that is "[u]sed of textiles"); Webster's Third New International Dictionary 1539 (1981) (defining "nonwoven" as something "made without weaving; *esp*: having textile fibers bonded together by adhesive resins, rubber, or plastic or felted together under pressure," *e.g.*, "fabrics").

*covered or laminated with rubber, leather or other material*," which are the type of products "used for card clothing."  *See* Note 7(a)(i) to Chapter 59, HTSUS (emphasis added); *see also* Def.'s Reply Brief at 8 (stating that "Note 7(a)(i) includes fabrics which resemble 'textile fabrics,' 'felt,' and 'felt-lined woven fabrics' which belong to the class to which fabrics used for 'card clothing' belong, but which are used for technical purposes different than 'card clothing'"); Pl.'s Reply Brief at 6 (arguing that Note 7(a)(i) "similar fabrics" must be similar to fabrics "of a kind used for card clothing").  In short, according to the terms of Note 7(a)(i), material is a "similar fabric" within Note 7(a)(i) if it: (1) is "of a kind used for other technical purposes"; and (2) possesses qualities similar to those listed in the first part of Note 7(a)(i).

To accept the Government's interpretation – that "similar" refers only to "[t]extile fabrics, felt and felt-lined woven fabrics" – would mean that the second part of Note 7(a)(i) broadly covers "fabrics of a kind used for technical purposes."  *See* Def.'s Brief at 15 (arguing that Note 7(a)(i) "clearly includes a variety of different fabrics which are used for different technical purposes, including 'card clothing' and 'weaving'").  But, as Airflow correctly points out, any such reading would render the first clause of Note 7(a)(i), as well as much of the remainder of Note 7(a), largely superfluous.  *See* Pl.'s Reply Brief at 9 & n.7 (stating that, "if the Government's argument were followed to its logical conclusion, *all* coated fabrics for *all* technical uses would be covered by Note 7(a)(i)," and that "many of the provisions of Note 7(a) would be subsumed within Note 7(a)(i)").

Here, the subject merchandise is clearly not similar to woven fabric or felt that is coated, covered, or laminated with rubber, leather, or other material – the type of fabric used for card clothing.  *See* Pl.'s Brief at 18-20; Pl.'s Reply Brief at 6-10.  As described above, card clothing

refers to the foundation or base material "through which many fine, closely spaced, specially bent wires project," and which is used to cover the cylinders of carding machines that operate to card (*i.e.*, disentangle) various textile fibers. *See* Pl.'s Statement of Facts ¶¶ 18-19.[20] For these reasons, card clothing "must possess four attributes: (1) strength; (2) flexibility or elasticity; (3) support; and (4) resistence to stretching[,]" and "must retain these attributes for a long period of time." *See* Pl.'s Statement of Facts ¶ 20; Def.'s Response to Pl.'s Statement of Facts ¶ 20; *see also* Pl.'s Brief at 11-14 (describing "card clothing").

Further, like card clothing fabric, the only "similar fabric" specifically identified in Note 7(a)(i) – "narrow fabrics made of velvet impregnated with rubber, for covering weaving spindles" – is also fastened to machinery for use in a mechanical process. *See* Note 7(a)(i) to Chapter 59, HTSUS (providing that "similar fabrics of a kind used for other technical purposes[] includ[es] narrow fabrics made of velvet impregnated with rubber, for covering weaving spindles (weaving beams)"). Like Note 7(a)(i) card clothing fabric, which is "coated, covered, or laminated with rubber, leather or other material," these weaving spindle fabrics are impregnated with rubber, presumably to provide the necessary strength, flexibility, and durability necessary to perform while maintaining their shape and withstanding continuous mechanical forces. *See* Pl.'s Reply Brief at 8 (stating that, "[l]ike card clothing foundation cloth, [Note 7(a)(i) weaving spindle fabrics] must necessarily possess the strength and durability to perform their function under demanding operating

---

[20]*See generally* Pl.'s Statement of Facts ¶¶ 17-28 (describing carding, carding machines, card clothing, and card clothing foundation cloth); Def.'s Response to Pl.'s Statement of Facts") ¶¶ 17-28 (admitting Airflow's descriptions, though disputing relevance); Pl.'s Brief at 11-14 (describing "card clothing").

conditions, as well as the flexibility and elasticity to be wound around the weaving beams and not

tear or become overly elongated").

Comparing these characteristics to the description of Sperifilt, it is clear that Sperifilt lacks

the qualities characteristic of the fabrics described in the first part of Note 7(a)(i), and is unlike the

sole example of "similar fabrics" specified in the second part of Note 7(a)(i).  *See generally* Pl.'s

Brief at 18-20; Pl.'s Reply Brief at 6-10.

As discussed above, Note 7(a)(i) fabrics – whether of a kind used for card clothing or for

other technical purposes – are coated, covered, laminated, or impregnated with rubber, leather or

other material, so that they possess the necessary strength, durability, and flexibility to fulfill their

functions while withstanding the stress of mechanical forces.  Sperifilt, on the other hand, is a light

and porous medium designed to trap solid particulates of varying sizes within its progressively

thickening layers during air filtration.  Unlike the fabrics specified in Note 7(a)(i) which cover

and/or support parts of a machine, Sperifilt is inserted as a panel into the ventilation system of an

industrial paint spray booth, and remains stationary during the air filtration process.  *See* Airflow

II, 524 F.3d at 1289 (describing Sperifilt); Airflow I, 31 CIT at 526, 483 F. Supp. 2d at 1340 (same);

 Pl.'s Statement of Facts ¶ 7 (explaining that Sperifilt filter media is cut into panels and inserted into

paint spray booths); Def.'s Response to Pl.'s Statement of Facts ¶ 7 (same).

Finally, although Sperifilt is impregnated with a tackifying substance and backed by a net

of polyester yarn (to provide dimensional stability under high temperature conditions and to prevent

particles from escaping), these attributes are not comparable to the rubber or leather coating,

covering, lamination, or impregnation to which Note 7(a)(i) refers.  Sperifilt's tackifying substance

and polyester net backing are designed to enhance Sperifilt's filtration capabilities.  The rubber or leather coating, covering, lamination, or impregnation of Note 7(a)(i) products, on the other hand, is intended to strengthen the material's flexibility and durability.  For these reasons, any similarity between Sperifilt and the "coated, covered[,] laminated" and "impregnated" fabrics described by Note 7(a)(i) is "irrelevant."  *See generally* Pl.'s Reply Brief at 9.

Thus, despite the Government's claims to the contrary – which it bases merely on broad dictionary definitions and without reference to the fact that "similar fabrics" must be "similar" to fabrics that are "coated, covered or laminated with rubber, leather or other material" – Sperifilt filter media is not similar to the fabrics identified in Note 7(a)(i) to Chapter 59.  *See* Def.'s Brief at 14-16; Def.'s Reply Brief at 7-9.  In sum, not only are Sperifilt filter media and the specified Note 7(a)(i) products dissimilar, but their fundamental and defining characteristics are at odds with one another:  Note 7(a)(i) products are designed to be  strong, sturdy, and supportive components of moving machines, while the subject merchandise is a porous, "high-loft," and stationary medium for air filtration.

For the reasons detailed above, Sperifilt is neither a fabric "of a kind used for card clothing" or a "similar fabric[] of a kind used for other technical purposes."  Sperifilt therefore does not fall within the scope of Note 7(a)(i) to Chapter 59, and is not classifiable under subheading 5911.10.20 of the HTSUS.

## 2. Note 7(b) to Chapter 59

Sperifilt also is not a "textile *article*" within the scope of Note 7(b) to Chapter 59, and therefore cannot be classified under subheading 5911.90.00, contrary to the Government's argument

in the alternative.  *See* Note 7(b) to Chapter 59, HTSUS (emphasis added); Def.'s Brief at 1-2, 6, 23,

25; Def.'s Reply Brief at 1, 15; *see generally* Def.'s Brief at 1-2, 6, 16-23, 25; Def.'s Reply Brief

at 1, 10-15.

As set forth above, Note 7(b) covers "[t]extile articles . . . of a kind used for technical

purposes (for example, textile fabrics and felts, endless or fitted with linking devices, of a kind used

in papermaking or similar machines (for example, for pulp or asbestos-cement), gaskets, washers,

polishing discs and other machinery parts)."  *See* Note 7(b) to Chapter 59, HTSUS.   The

Government contends that Note 7(b) "[broadly] encompasses 'textile articles' which, as properly

defined, includes textile 'products.'"  *See* Def.'s Brief at 19; *see also id.* at 16-19; Def.'s Reply Brief

at 10.  Based on that expansive reading, the Government argues that "Sperifilt is clearly an 'article'

as the term is commonly defined."  *See* Def.'s Brief at 19; *see also* Def.'s Reply Brief at 10 (arguing

that "[b]ecause Sperifilt is a kind of filter media, there can be no legitimate dispute that it falls within

the meaning of the term 'article' and, therefore, is a 'textile article' within the scope of . . . Note

7(b)").[21]  According to the Government, nothing in the text of the subheading, or the chapter notes,

or the Explanatory Notes precludes textile goods that are imported in rolls and cut post-importation

– such as the subject merchandise – from being classified under subheading 5911.90.00.  *See* Def.'s

Reply Brief at 10.  The Government concludes that Sperifilt is within the scope of Note 7(b) to

Chapter 59 and is classifiable under subheading 5911.90.00 because Sperifilt is a finished good

-----

[21]In the previous stage of this litigation, the Government initially stated that it does not claim
that the subject merchandise is a "textile article."  *See* Defendant's Responses to Plaintiff's First
Interrogatories and Requests for Production ¶ 4(a).  However, as the Government points out, that
statements was "based upon [its] claims as they existed at the time [prior to decision in <u>Airflow II</u>].
*See* Def.'s Brief at 19; *see also id.* at 17-19.

dedicated for use as an air filtration medium upon importation.  *See* Def.'s Brief at 19; Def.'s Reply

Brief at 10-15.

However, the Government's claim that Note 7(b) "textile articles" encompass "textile

products" ignores Note 7's fundamental distinction between "products" and "articles."  *See*

*generally* Pl.'s Reply Brief at 11-12 (arguing that "[i]nterpreting the unambiguous language of Note

7(b) to include both textile *products* and textile *articles*, as claimed by the Government, disregards

the clear separation of Note 7(a) and (b) and renders Note 7(a) meaningless and superfluous").

Unlike Note 7(a), which describes a variety of "textile *products*" (whether "in the piece, cut to

length or simply cut to rectangular . . . shape"), Note 7(b) is strictly limited to "textile *articles.*"  *See*

Note 7 to Chapter 59, HTSUS (emphases added); *see also* Explanatory Notes, Heading 5911, at (A)

and (B).  Based on the deliberate use of these two distinct terms within the same chapter note, the

inescapable conclusion is that Note 7(a) "textile products" and Note 7(b) "textile articles" refer to

different types of goods, and Note 7 must be read and applied accordingly.

Although sometimes used interchangeably in common parlance, the terms "product" and

"article" – for purposes of Note 7 to Chapter 59 – must be given different meanings.  A "product"

is defined broadly as "something produced" by either "physical labor or intellectual effort," "a

natural process," or "chemical change."  *See* Webster's Third New International Dictionary 1810

(1981); *see also* American Heritage Dictionary of the English Language 1399 (4th ed. 2000)

(defining "product" as "[s]omething produced by human or mechanical effort or by natural

process").  An "article," on the other hand, is "a material thing[,] item, object"; "a thing of a

particular class or kind as distinct from a thing of another class or kind."  *See* Webster's Third New

International Dictionary 123 (1981); *see also* American Heritage Dictionary of the English Language 101-02 (4th ed. 2000) (defining "article" as, *inter alia*, "[a]n individual thing or element of a class; a particular object or item: [*e.g.*,] an article of clothing; articles of food" ).

As discussed in greater detail below, as the terms are used in Note 7 to Chapter 59, a "textile product" appears to refer to textile materials (*e.g.*, textile fabrics, felts, cloth), whereas a "textile article" refers to a textile object or item with a fixed identity and dimensions (*e.g.*, gaskets, washers, polishing disks).  *See* Pl.'s Brief at 22 (explaining that "textile *materials* of Chapter Note 7(a) are textile products which are used to make finished goods; the textile *articles* of Chapter Note 7(b) are finished goods themselves").

The distinction between a "textile product" and a "textile article" for purposes of Note 7 to Chapter 95 is illustrated by the specific examples of such goods set forth in Note 7 and in the relevant Explanatory Notes.  *See* Note 7 to Chapter 59, HTSUS; Explanatory Notes, Heading 5911, at (B); *see also* Pl.'s Reply Brief at 12-13 (stating that "the language of Note 7(b) itself[ and] the [Explanatory Notes] to heading 5911 . . . confirm that Note 7(b) 'articles' are *not* textile materials imported in rolls and cut post-importation").

Note 7(a) provides for certain textile *materials* (albeit, in some cases, somewhat advanced materials) that may be imported in rolls or bolts, such as "[b]olting cloth," "[s]training cloth," "[f]lat woven textile fabrics . . . of a kind used in machinery," and "[t]extile fabric reinforced with metal." *See* Note 7(a) to Chapter 59, HTSUS; *see also* Pl.'s Brief at 11 n.8 (stating that "Note 7(a) textile products are those imported either uncut (in rolls or bolts) or subject only to certain simple cutting steps"); Pl.'s Reply Brief at 12-13.  In contrast, Note 7(b) covers specific *objects* or *items* –

"machinery parts" made of textiles, such as "gaskets, washers, [and] polishing discs," and endless

fabric used in papermaking machines – rather than textile material that may be imported in rolls or

bolts and subsequently used to make objects or items.  *See* Note 7(b) to Chapter 59, HTSUS; *see*

*also* Pl.'s Reply Brief at 12 (stating that "Note 7(b) 'articles' are *not* textile materials imported in

rolls  and  cut  post-importation").    Similarly,  the  examples  of  Note  7(b)  articles  listed  in  the

Explanatory Notes also include only articles that have been "made up," *i.e.*, "cut to shape" and/or

"assembled by sewing."  *See* Explanatory Notes, Heading 5911, at (B); *see also* Note 7 to Section

XI, HTSUS (defining "made up").[22]

_____

[22]The Explanatory Notes state that Note 7(b) covers "[a]ll textile articles of a kind used for technical purposes (other than those of headings 59.08 to 59.10)," for example:

(1)  Any  of  the  fabrics  of  [Note  7(a)]  which  have  been  made  up  (cut  to  shape, assembled by sewing, etc.), for example, straining cloths for oil presses made by assembly of several pieces of fabric; bolting cloth cut to shape and trimmed with tapes or furnished with metal eyelets or cloth mounted on a frame for use in screen printing.

(2)  Textile fabrics and felts, endless or fitted with linking devices, of a kind used in paper-making or similar machines (for example, for pulp or asbestos-cement) (excluding machinery belts of heading 59.10).

(3)  Articles formed of linked monofilament yarn spirals and having similar uses to the textile fabrics and felts of a kind used in paper-making or similar machines referred to in (2) above.

(4)  Gaskets and diaphragms for pumps, motors, etc., and washers (excluding those of heading 84.84).

(5)  Discs, sleeves and pads for shoe polishing and other machines.

(6)  Textile bags for oil presses.

(7)  Cords cut to length, with knots, loops, or metal or glass eyelets, for use on Jacquard or other looms.

(8)  Loom pickers.

(9)  Bags for vacuum cleaners, filter bags for air filtration plant, oil filters for engines, etc.

Explanatory Notes, Heading 5911, at (B) (emphases omitted).

Indeed, the Explanatory Notes specifically make the point that Note 7(a) "textile products" constitute the type of material from which Note 7(b) "textile articles" may be made. *See* Explanatory Notes, Heading 5911, at (B)(1) (stating that Note 7(b) articles include "[a]ny of the fabrics of [Note 7(a)] which have been made up (cut to shape, assembled by sewing, etc.)"); *see also* Pl.'s Brief at 22 (explaining that "textile *materials* of Chapter Note 7(a) are textile products which are used to make finished goods; the textile *articles* of Chapter Note 7(b) are finished goods themselves"). In sum, it is clear from these examples that, unlike Note 7(a) "textile products," which may be imported in rolls or bolts, Note 7(b) "textile articles" upon importation possess the fixed identity and specific dimensions required for use with a particular machine or for some other specific technical application.[23]

Airflow points to case law distinguishing between certain articles (or parts thereof) and the material from which such articles are made (which is often imported in rolls) to further bolster its position (by analogy, if nothing else).[24] As Airflow notes, "[w]here textile goods are imported 'in

---

[23]Gasket and washers, for example, are typically manufactured in standard sizes. Similarly, polishing discs, bags for oil presses, vacuum cleaner bags, and filter bags all are generally manufactured for use with particular models and machinery upon importation.

[24]*See, e.g.*, Baxter Healthcare Corp. of Puerto Rico v. United States, 182 F.3d 1333, 1339 (Fed. Cir. 1999) (considering classification of rolls of material for use as gas-exchanging membrane of oxygenator, and concluding that material cannot be classified as part of oxygenator because "[a]t the time of import, the individual parts cannot be discerned from the roll, and the roll nowhere marks or otherwise identifies the individual parts to be made from it"); Harding Co. v. United States, 23 C.C.P.A. 250, 252-53 (1936) (holding that item made from asbestos yarn, wire, and mixture of other materials, used for the sole purpose of making brake linings, was properly classified as manufacture of yarn rather than as "part" of automobile because individual brake lining parts to be made from material were not identified or otherwise "fixed with certainty," and instead had to be individually cut to custom fit each brake shoe made); United States v. Buss & Co., 5 U.S. Cust. App. 110, 113 (1914) (recognizing that "most small articles are not produced as individual or separate products of

the piece' or uncut, those goods cannot be considered or classified as 'articles' [when] the individual

finished articles to be made from those goods are not 'fixed with certainty' at the time of importation

(such as where the amount or number of unfinished goods that could be made from a particular roll

or bolt of fabric is unknown at the time of importation)."  *See* Pl.'s Brief at 22-23; *see also id.* at 23-

25 (citing cases); Pl.'s Reply Brief at 14-15 (same).

      In the present case, as Airflow underscores, the subject entries of Sperifilt filter media were

---

the loom, but for economy of manufacture are first woven 'in the piece,'" and stating that "where such articles are imported in the piece and nothing remains to be done except to cut them apart they shall be treated for dutiable purposes as if already cut apart and assessed according to their individual character or identity," but "only [where] the character or identity of the individual articles is fixed with certainty and [where] the woven piece in its entirety is not commercially capable of any other use"); <u>Benteler Indus., Inc. v. United States</u>, 17 CIT 1349, 1354-57, 840 F. Supp. 912, 915-18 (1993) (concluding that seamless steel tubular sections used in automobile manufacturing could be classified as parts thereof because number of beams to be cut exactly from each section was known prior to importation); <u>Coraggio Design, Inc. v. United States</u>, 12 CIT 143, 147 (1988) (considering classification of fabric with pre-woven hems used to make drapery and stating that "[a]s the rule of <u>Buss</u> and its progeny make apparent, material cannot be classified as more than woven fabric when it is not processed to the point where the individual 'article' is identifiable with certainty, not cut to specific lengths or marked for cutting, and not advanced to point where significant processing steps no longer remain"); <u>Bendix Mouldings, Inc. v. United States</u>, 388 F. Supp. 1193, 1194-95 (Cust. Ct. 1974) (concluding that uncut wood moldings used only to make picture frames, but not dedicated to making of any particular picture frame were not classifiable as unfinished frames; only as material from which frames made); *see also* Pl.'s Brief at 22-25 (citing cases); Pl.'s Reply Brief at 14-15 (same).  *But see* <u>Ludvig Svensson (U.S.) Inc. v. United States</u>, 23 CIT 573, 580-81, 62 F. Supp. 2d 1171, 1178-79 (1999) (classifying screening used solely in construction of greenhouses, which is imported in rolls and cut to length to meet customer specifications, as parts of agricultural machinery, rather than as material, because function and purpose of screening identifiable upon importation and post-importation processing merely attributable to installation).

      The Government disputes the relevance of many of these cases cited by Airflow, objecting that some "address whether an article is classifiable as a 'part' or as a 'material,'" while others (such as <u>Coraggio Design</u> and <u>Bendix Mouldings</u>) were decided under the predecessor to the HTSUS.  *See* Def.'s Reply Brief at 12; Def.'s Brief at 22 (same).  The cases nevertheless speak to the distinction between "materials" imported in rolls or lengths and "articles."  *See* Pl.'s Reply Brief at 15.

imported as rolls that had "no pre-cuts, cutting marks, or any other indication whatsoever as to the

length and width to which the imported [media] was to be cut." *See* Pl.'s Brief at 26; *see also* Pl.'s

Reply Brief at 12-16.  Rolls of Sperifilt are generally – if not always – cut post-importation to the

specific dimensions required for installation into one of approximately 150 different spray booth

models in which it is used. *See* Pl.'s Brief at 26.[25]  Airflow further emphasizes that "Sperifilt [was]

never dedicated to filling a particular customer order at the time of importation," and that, "[g]iven

---

[25]There is some dispute as to whether the imported rolls of Sperifilt are *always* cut post-importation to fit the dimension of a particular customer's paint spray booth.  There is no apparent reason why a roll of Sperifilt could not be installed as imported, without any cutting, if some specific application required a filter of the exact dimensions of the roll as imported.  However, there is no specific record evidence of any such use.  To the contrary, the Government has acknowledged that "'Sperifilt filter media is cut to size to fit within individual paint spray booths according to the orders received.'" *See* Def.'s Response to Pl.'s Statement of Facts ¶7, ¶8 (*quoting* Wittert Affidavit (Aug. 24, 2005) ¶ 7); *see also* Def.'s Brief at 20 (acknowledging that Sperifilt filter media is cut to size); Def.'s Reply Brief at 11 (same); Recording of Oral Argument at 2:13:20-2:13:40 (Government counsel stated that "[the Government does] not dispute that Sperifilt . . . is cut; but we can also not say that it is not used in its imported condition[.]"); Pl.'s Statement of Facts ¶ 5 (stating that "[a]ll or virtually all (approximately 99 percent) of Sperifilt media was cut to length, and sometimes cut to width as well, after importation into the United States and before delivery to a customer"); Pl.'s Statement of Facts ¶ 10 (stating that "[w]hen filling a customer purchase order for Sperifilt, Airflow . . . was always required to cut the Sperifilt" because "the required size of Sperifilt would differ for each paint spray booth").

Contrary to the Government's characterization, an Airflow representative's statement that "[p]aint spray booths are frequently designed so that the filter media can be unrolled as one complete blanket to cover the spray booth ceiling rather than having the filter media installed in ring panel as a separate framing system" indicates only that Sperifilt is sometimes used in large, single pieces, and does not indicate that an entire roll of Sperifilt filter media, as imported, is sometimes used uncut in its entirety in spray booths, as the Government implies. *See* Pl.'s Reply Brief at 19 (*quoting* Wittert Affidavit (July 31, 2003) ¶ 14) (internal quotation marks omitted); *see also* Pl.'s Reply Brief at 17-21 (countering Government's attempt to dispute other statements made by Airflow's president and co-founder); Def.'s Brief at 22; Pl.'s Statement of Facts ¶ 8 (stating that "[n]one of the models of paint spray booths was large enough to accommodate an entire uncut roll of Sperifilt, as imported").

the extreme variation in sizes required for finished Sperifilt panels, it was impossible to know how many Sperifilt panels could be made from any particular imported roll of Sperifilt at the time of importation."  *See* Pl.'s Brief at 26.

The imported item at issue here is the generic *roll* of Sperifilt filter media from which individual air filters will be fashioned following importation.  And although the roll of Sperifilt possesses the necessary air filtration characteristics at the time of importation, there is no "textile *article*" until the imported product is matched (and cut from the roll and shaped, if necessary) to the precise dimensions of a specific industrial paint spray booth *after importation*.  For all these reasons, Sperifilt filter media, as imported, is not a "textile article" within the meaning of Note 7(b) to Chapter 59 of the HTSUS.

Nor can the subject merchandise be considered an "incomplete" textile article within Note 7(b) by application of GRI 2(a), as the Government seeks to argue.  *See* Def.'s Brief at 20 (arguing that "even if Sperifilt could be considered an 'incomplete' textile article in its imported condition, it would nevertheless fall within Chapter 59 Note 7(b)" because at the time of importation "Sperifilt has . . . all of the essential characteristics of a filtration media which is actually used in paint spray booths"); *see generally* Def.'s Brief at 20-21; Def.'s Reply Brief at 11-15; *but see* Pl.'s Reply Brief at 16-21 (disputing the Government's argument on this point).

Addressing certain incomplete or unfinished articles, GRI 2(a) provides, in relevant part, that "[a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the *essential character* of the complete or finished article."  *See* GRI 2(a), HTSUS (emphasis added);

*see also* Explanatory Notes, GRI 2(a), at (I) (stating that GRI 2(a) "extends the scope of any heading which refers to a particular article" to include incomplete or unfinished version of article so long as it possess "essential character of the complete or finished article").  Thus, unless the terms of a heading require otherwise, GRI 2(a) essentially functions to expand the scope of any GRI 1 analysis to include certain unfinished articles.  *See* ABB, Inc. v. United States, 421 F.3d 1274, 1276 n.4 (Fed. Cir. 2005) (stating that "[a]lthough it is well settled law that merchandise is classified according to its condition when imported, [GRI] 2(a) provides that any reference in a heading to an article shall be taken to include a reference to that article entered unassembled" (internal quotation marks and citation omitted)).

Here, the Government argues that, even if Sperifilt is considered "incomplete" upon importation, it nevertheless falls within the scope of Note 7(b) to Chapter 59 by virtue of GRI 2(a), because it possesses the essential characteristics of an industrial paint spray booth air filter.  *See* Def.'s Brief at 20-21; Def.'s Reply Brief at 11-12.  According to the Government, the "simple cutting" required to fashion a filter panel to fit into a particular spray booth's dimensions "does not alter the essence, character, or use of Sperifilt [filter media]."  *See* Def. Reply Brief at 11.

However, as outlined above, interpreting the language of Note 7(b) to include both textile products (whether referred to as textile material, "unfinished" textile articles, or otherwise) in addition to "textile articles" would "disregard[] the clear separation of Note 7(a) and (b) and render[] Note 7(a) meaningless and superfluous."  *See* Pl.'s Reply Brief at 11; *see also* Faus Group, Inc. v. United States, 28 CIT 1879, 1904 n.44, 358 F. Supp. 2d 1244, 1266 n.44 (2004) (noting that GRI 1 limits the scope of GRI 2(a) to only those situations where "such headings or notes do not

otherwise require" (*quoting* GRI 1, HTSUS) (internal quotation marks omitted)).

The Government's GRI 2(a) theory ignores the fact that the HTSUS term at issue is "textile articles," not "industrial paint spray booth air filters."  Contrary to the Government's claim, for a good to be classified as an incomplete or unfinished "textile article" of heading 5911 (as specified in Note 7(b)), GRI 2(a) requires that it possess, among other things, the essential character of a "textile article."  *See* GRI 2(a), HTSUS; Heading 5911, HTSUS.  And, as detailed above, an essential characteristic of a Note 7(b) "textile article" is dimensions fixed with certainty upon importation.  The Sperifilt at issue here cannot be classified as unfinished "textile articles," because – as imported, in unmarked rolls – Sperifilt lacks the fixed dimensions of a Note 7(b) "textile article."  *See* Pl.'s Reply Brief at 16-17 (quoting Customs headquarters ruling letter stating "that for textile materials . . . to be classified under the HTSUS as unfinished articles pursuant to GRI 2(a), the identity of the finished articles to be made from those materials must be fixed with certainty" (internal quotation marks and citation omitted)).

Notwithstanding Sperifilt's air filtration capabilities upon importation, an unmarked roll of Sperifilt filter media, as imported, does not possess the character of an individual air filter panel (which arguably could be considered a "textile article").  Because a roll of Sperifilt filter media lacks the fixed dimensions and identity central to classification as a "textile article," it does not possess the "essential character" of a completed "textile article," and therefore cannot be considered an "incomplete" or "unfinished" textile article pursuant to GRI 2(a).

To be sure, an imported roll of filter media will at some point most likely be fashioned into one or more textile "articles," *i.e.*, panels of air filter media.  But because the requisite dimensional

characteristics of such "textile articles" were not established or designated at the time of importation,

a roll of Sperifilt filter media is neither a completed Note 7(b) "textile article" nor an "incomplete"

or "unfinished" Note 7(b) "textile article."  For the foregoing reasons, the subject merchandise is

not covered by Note 7(b) to Chapter 59, and thus is not classifiable under subheading 5911.90.00

of the HTSUS.

## B.  Heading 5603

Because the subject merchandise is not within the scope of Note 7 to Chapter 59, it is not

classifiable under heading 5911.   Thus, the Explanatory Note to heading 5603 that excludes

classification thereunder in instances where a good is also *prima facie* classifiable under heading

5911 is inapplicable.

As set forth above, the entries of Sperifilt at issue here cannot be classified under heading

5911 of the HTSUS.  The competing heading – which Airflow presses – is heading 5603, which

covers "Nonwovens, whether or not impregnated, coated, covered or laminated."  *See* Heading 5603,

HTSUS; Pl.'s Brief at 1, 5, 30; Pl.'s Reply Brief at 21-22.[26]

Goods classified within Chapter 56 are "textile products of a special character, *e.g.*, wadding,

felt, *nonwovens*, special yarns, cordage and certain articles of these materials."   *See* General

Explanatory Notes, Chapter 56 (emphasis added).  A heading 5603 "nonwoven" is "a sheet or web

---

[26]Note 3 to Chapter 56 provides that heading 5603 covers nonwovens that are "impregnated, coated, covered or laminated with plastics or rubber whatever the nature of these materials (compact or cellular)," and that the heading "also includes nonwovens in which plastics or rubber forms the bonding substance."  *See* Note 3 to Chapter 56, HTSUS.  Note 3 to Chapter 56 also describes a number of goods that are excluded from classification under heading 5603, but which have no bearing on this case.  *See* Note 3 to Chapter 56, HTSUS.

of predominantly textile [fibers] oriented directionally or randomly and bonded." *See* Explanatory Notes, Heading 5603.[27]   The fibers of a nonwoven "may be of natural or man-made origin," and "may be staple [fibers] (natural or man-made) or man-made filaments or be formed *in situ*." *See* Explanatory Notes, Heading 5603.   Nonwovens "can be produced in various ways and [their] production can be conveniently divided into . . . three stages: web formation, bonding [including thermal bonding] and finishing." *See* Explanatory Notes, Heading 5603; *see also* Explanatory Notes, Heading 5603, at I, II, and III (describing web formation, bonding, and finishing).[28]

The Explanatory Notes provide that, "[e]xcept where they are covered more specifically by other headings in the Nomenclature, [heading 5603] covers nonwovens in the piece, cut to length or simply cut to rectangular (including square) shape from larger pieces without other working, whether or not presented folded or put up in packings (*e.g.*, for retail sale)." *See* Explanatory Notes, Heading 5603 (emphasis omitted).   In addition, among other things, the Explanatory Notes expressly state that heading 5603 covers "[nonwoven] sheets for filtering liquids or air." *See* Explanatory

---

[27]"Nonwoven" is defined as "[m]aterial or . . . fabric made by a process not involving weaving." *See* American Heritage Dictionary of the English Language 1198 (4th ed. 2000); *see also* Webster's Third New International Dictionary 1539 (1981) (defining "nonwoven" as something "made without weaving; [especially] having textile fibers bonded together by adhesive resins, rubber, or plastic or felted together under pressure," *e.g.*, "fabrics").

[28]The Explanatory Notes further indicate that "[n]onwovens differ in thickness and in their characteristic features (flexibility, elasticity, resistance to tearing, absorbency, stability, etc.) according to the manufacturing or bonding process, the density of the [fibers] or filaments and the number of webs"; and that "the fact that the textile [fibers] or filaments are bonded throughout the thickness, and generally throughout the width, of the web or sheet also helps to distinguish these fabrics from certain types of wadding of heading 56.01 [(covering, *inter alia*, wadding of textile materials)]." *See* Explanatory Notes, Heading 5603.

Notes, Heading 5603.[29]  Heading 5603 "nonwovens" may also be "covered on one or both surfaces (by gumming, sewing or by any other process) with textile fabric or with sheets of any other material," so long as they continue to "derive their essential character from the nonwoven."  *See* Explanatory Notes, Heading 5603, at III.

In the case at bar, both parties agree that Sperifilt is *prima facie* classifiable under heading 5603.  *See* Def.'s Brief at 23 (stating that, "as [the Government has] previously acknowledged, Sperifilt is a nonwoven and is *prima facie* classifiable in Heading 5603"); Pl.'s Brief at 7, 30; Pl.'s Reply Brief at 21; *see also* Airflow II, 524 F.3d at 1290 (stating that "[t]he [G]overnment did not dispute that Sperifilt is *prima facie* classifiable under heading 5603"); Airflow I, 31 CIT at 527, 483 F. Supp. 2d at 1341 (noting that "[t]he Government does not dispute that Sperifilt filter media is *prima facie* classifiable under HTSUS heading 5603").

Indeed, in light of Airflow II and the analysis of heading 5911 set forth above, the subject entries of Sperifilt must be classified under heading 5603.  Sperifilt filter media is a nonwoven made of thermobonded polyester staple fibers, impregnated with an adhesive, and attached to a polyester yarn backing.  The language of heading 5603 expressly covers impregnated nonwovens.  And although Sperifilt incorporates a polyester yarn backing, that backing does not remove Sperifilt from the scope of heading 5603.  *See* Explanatory Notes, Heading 5603, at III.[30]  Moreover, as noted

---

[29]*See*, *e.g.*, FilmTec, 27 CIT 1730, 293 F. Supp. 2d 1364 (classifying nonwoven fabric sheets imported in rolls and used as part of filter medium under heading 5603, rather than heading 5911).

[30]The nonwoven "component" constitutes 78 % of the subject merchandise's weight, and the additional elements – the adhesive and the polyester backing – merely enhance and provide stability for the nonwoven medium, which is "layered and assembled in such a way as to achieve a weight and thickness sufficient to create a filter medium."  *See* Joint Statement of Material Facts at ¶¶ 11-

above, the Explanatory Notes specifically provide that heading 5603 covers nonwoven air filtration media, such as Sperifilt.  *See* Explanatory Notes, Heading 5603.

Because "[t]he weight of the completed Sperifilt filter media ranges between 540 and 600 $g/m^2$," the appropriate subheading is subheading 5603.94.90, which covers "Nonwovens, whether or not impregnated, coated, covered or laminated: Other: Weighing more than 150 $g/m^2$: Other: Other," and is duty-free.  *See* Subheading 5603.94.90, HTSUS; Joint Statement of Material Facts at ¶11, ¶12 (describing components of Sperifilt filter media, and explaining that each sheet of polyester staple fiber (several of which are bonded together to form the nonwoven media) weighs approximately 50 $g/m^2$).

## IV.  Conclusion

In light of <u>Airflow II</u> and for all the reasons set forth above, the subject entries of Sperifilt filter media must be classified under subheading 5603.94.90 of the HTSUS.  Plaintiff's motion for summary judgment must therefore be granted, and Defendant's cross-motion is denied.

Judgment will enter accordingly.

/s/ Delissa A. Ridgway
_____
Delissa A. Ridgway
Judge

Decided:  October 31, 2011
              New York, New York

---

15; *see also* Pl.'s Statement of Facts ¶ 1 (stating that, "[w]ith the exception of . . . paragraph 6, Plaintiff repeats and reincorporates ¶¶ 1-28 of the parties' joint statement of material facts as to which there is no genuine issue to be tried, submitted in connection with the original proceeding in this case").

UNITED STATES COURT OF INTERNATIONAL TRADE

AIRFLOW TECHNOLOGY, INC.,           :

                        *Plaintiff*,          :

                v.                  :        Court No. 02-00099

UNITED STATES,                      :

                        *Defendant*.         :

## **JUDGMENT**

This action having been duly submitted for decision; and the Court, after due deliberation, having rendered a decision herein;

NOW, therefore, in conformity with said decision, it is

ORDERED that Plaintiff's motion for summary judgment be, and hereby is, granted; and it is further

ORDERED that Defendant's cross-motion for summary judgment be, and hereby is, denied; and it is further

ORDERED that the subject merchandise is classifiable as "Nonwovens, whether or not impregnated, coated, covered or laminated: Other: Weighing more than 150 $g/m^2$: Other: Other," under subheading 5603.94.90 of the Harmonized Tariff Schedule of the United States ("HTSUS"); and it is further

ORDERED, ADJUDGED, and DECREED that the Bureau of Customs and Border Protection of the U.S. Department of Homeland Security shall reliquidate all subject entries in accordance with the opinion of the Court under the above-referenced HTSUS subheading and shall refund to Plaintiff any excess duties paid, together with interest thereon as provided by law.

                              /s/ Delissa A. Ridgway
                        _____
                            Delissa A. Ridgway, Judge

Dated:  October 31, 2011
        New York, New York